IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN SECKA, | ) | CASE NO. 4:16-cv-01556 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kevin Secka ("Plaintiff" or "Secka") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14. As explained more fully below, the Court is unable to assess whether the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence because the ALJ's finding that Secka did "not have any neurological deficits" appears, in the absence of further explanation, to be contrary to the evidence of record. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for proceedings consistent with this Opinion.

# I. Procedural History

Secka protectively filed[1] an application for Disability Insurance Benefits ("DIB") on August 23, 2012.[2]  Tr.  41, 119, 147, 255-256, 324.   Secka alleged a disability onset date of June 1, 2010.  Tr. 41, 119, 255, 324.  Secka alleged disability due to disc degeneration, arthritis, nerve damage, depression, back injury, and high blood pressure.  Tr. 119, 167, 177, 328.  Secka's application was denied initially (Tr. 167-175) and upon reconsideration by the state agency (Tr. 177-183).   Thereafter, he requested an administrative hearing.  Tr. 184-185.

On June 24, 2014, an administrative hearing was conducted by Administrative Law Judge John C. Lyons ("ALJ").  Tr. 61-89.   On January 14, 2015, the ALJ issued his decision.  Tr. 38-60.  In his decision, the ALJ determined that Secka had not been under a disability within the meaning of the Social Security Act from June 1, 2010, through the date of the decision.  Tr. 42, 53.  Secka requested review of the ALJ's decision by the Appeals Council.  Tr. 37.  On May 2, 2016, the Appeals Council denied Secka's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, vocational and educational evidence

Secka was born in 1973.  Tr. 255.  He was 41 years old at the time of the hearing and lived in a house with his fiancé, his fiancé's adopted 2-year old son and 19 year-old daughter.  Tr. 63-64.  Also, Secka's fiancé's 22-year old son lived with them while he was not attending

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/19/2017).

[2] Prior to the August 23, 2012, application, Secka filed other applications of social security disability, which were withdrawn or denied.  Those prior applications are not at issue in this case but information regarding them is in the record and is included herein for context.  *See e.g.*, Tr. 44, 71, 90-106, 148-164, 271-323.

college.  Tr.  63.  Secka's minor daughter used to live with him but lived with her mother since 2013.  Tr. 50, 63, 64.  Secka graduated from high school and attended New Castle School of Trade in New Castle, PA, where he earned an Associate's Degree in Applied Sciences in Heating and Cooling in 2001.  Tr. 329, 613.  Secka last worked in 2010.  Tr. 65.

## B.    Medical evidence

### 1.  Treatment history

Secka has a history of back pain dating back to at least 2005 when he underwent a bilateral L5-S1 lumbar microdiscectomy on November 22, 2005.  Tr. 401-402, 409-410, 415-416, 425.  Dr. Parviz Baghai, M.D., a neurosurgeon associated with Allegheny General Hospital performed the surgery.  Tr. 409-410, 425.  Following his surgery, Secka returned to work.  Tr. 423.

On October 23, 2006, Secka returned to see Dr. Baghai reporting he had been doing well up until three weeks prior.  Tr. 423.  Secka had experienced low back pain when he moved suddenly while in bed.  Tr. 423.  Following that, he was carrying a furnace and experienced an increase in his symptoms.  Tr. 423.  He was able to continue work until a week prior to his visit with Dr. Baghai when he fell at work.  Tr. 423.  Dr. Baghai's examination showed a positive straight leg raise at about 60 degrees bilaterally and some give-way weakness in both dorsiflexors.  Tr. 423.  Dr. Baghai diagnosed recurrent lumbar radiculopathy and ordered an EMG and MRI of the lumbar spine.[3]  Tr. 423.  On November 13, 2006, Secka saw his treating physician Michael T. Guffey, M.D., regarding his back pain.  Tr. 458.

---

[3] An MRI was taken on October 30, 2006, showing findings compatible with postoperative scar of the epidural space at L5-S1, enhancement of the posterior aspect of disc space at L5-S1 that could be related to postoperative change, and demonstration of changes in the bone marrow signal at the anterior one-half of the L5 vertebral body, possibly inflammatory.  Tr. 480.  An EMG Nerve Conduction study showed old damage.  Tr. 439.

Secka continued to see Dr. Guffey in 2006 and in 2007 with reports of back pain with the pain radiating down into his legs. Tr. 453-460. In March 2007, a lumbar spine MRI was performed. Tr. 472-473. Dr. Guffey indicated that the MRI showed a moderate bilateral foraminal stenosis and a mild spinal stenosis at the L5-S1 level, which is where Secka had his prior microdiscectomy. Tr. 454. Dr. Guffey noted that Secka might require further surgery and he referred Secka to Dr. Baghai for surgical evaluation. Tr. 454. Also, in early 2007, Secka saw Dr. Michael R. Cozza, M.D., for pain management at Beaver Valley Rehabilitation Associates. Tr. 439-442. Physical therapy was attempted without improvement. Tr. 441.

In 2007, Secka filed applications for social security disability. Tr. 44, 90-92. However, Secka received some relief from injections and, on June 12, 2008, he notified social security that his condition had improved and he no longer wanted to pursue his social security disability application. Tr. 44, 71, 159.

On June 1, 2010, Secka experienced an injury at work while lifting a bread machine. Tr. 574, 566. He experienced pain in his low back and up and down both legs. Tr. 574. Following his work injury, on August 3, 2010, Secka started pain management treatment. Tr. 489-492. He saw Dr. LoDico at Advanced Pain Medicine. Tr. 489-492. Secka reported pain across his entire low back with radiation into the lateral and posterior aspects of bilateral lower extremities. Tr. 489. He reported numbness, tingling, and burning sensation in the same areas. Tr. 489. Secka also reported weakness in his bilateral lower extremities but denied falling as a result of the weakness. Tr. 489. Secka reported little relief obtained through the use of pain medication, TENS unit, or physical therapy. Tr. 489. On physical examination, Dr. LoDico observed that Secka was able to sit and converse comfortably with no demonstration of overt pain behaviors; he rose from a seated position with the assistance of arms; his gait was nonantalgic; he walked

with his lumbar spine slightly flexed forward due to pain; he was able to heel walk, toe walk, and squat with moderate difficulty secondary to pain; he had moderate tenderness to palpation in the midline and bilateral lumbar paraspinal muscles; lower extremity strength evaluation showed 5 out of 5 muscle strength in bilateral hip flexion, knee flexion/extension, ankle dorsiflexion/plantar flexion; he had decreased sensation to light touch in the lateral aspects of the right lower leg distal to the knee; he had decreased sensation to temperature in the lateral aspects of bilateral lower legs; straight leg raise was positive on the right and negative on the left; and there were no palpable cords, muscle spasms or true trigger points. Tr. 490. Dr. LoDico's assessment was "Lumbar spinal pain secondary to discogenic syndrome versus facet arthropathy, history of lumbar spine diskectomy in 2005[.] Lumbar extremity radicular syndrome. Significant pain relief after lumbar epidural steroid injections in the past." Tr. 490-491. Dr. LoDico recommended lumbar epidural steroid injections as well as a lumbar MRI and possible EMG nerve conduction studies of the bilateral lower extremities. Tr. 491.

Secka had injections administered on August 6 and August 20, 2010. Tr. 493-495, 496-498. On September 15, 2010, Secka reported that, since the two injections, he was nearly 100% improved. Tr. 499. Secka declined further injections at that time and Secka was advised to call to schedule another injection if his symptoms increased. Tr. 499. About two weeks later, on September 28, 2010, Secka reported that his lumbar spinal pain had increased significantly. Tr. 501. Secka was started on Hydrocodone, EMG nerve conduction studies of the bilateral lower extremities were scheduled, and a referral to a neurosurgeon was made for evaluation of possible surgical intervention. Tr. 501.

EMG nerve conduction studies were performed on October 1, 2010, which showed bilateral L4 and right L5 radiculopathy without new or active denervation, bilateral tibial[4] motor mononeuropathy, bilateral sural[5] sensory mononeuropathy. Tr. 504, 510, 560-562. On October 7, 2010, Secka continued to report increased pain and indicated that the Hydrocodone was not helping. Tr. 504. Secka's October 7, 2010, physical examination was generally normal aside from his gait being slow, squatting with some discomfort, and rising from a seated position with the assistance of his arms. Tr. 504. Hydrocodone was discontinued and Secka was prescribed Opana, Lyrica, and Mobic. Tr. 505. On October 20, 2010, Secka reported increased pain in his back, with improvement noted with flexing forward. Tr. 507. Secka reported no side effects from the Opana but stated that it was not helping adequately with his pain. Tr. 507. He requested an increase in the dosage. Tr. 507. Physical examination revealed that Secka was uncomfortable but in no acute distress; he rose from a seated position slowly with the assistance of his arms and walked in a forward flexed position; his gait was slow and antalgic; he was tender over the bilateral lumbar paraspinal muscles, the right more than the left and over the lumbar area midline; there were no palpable cords or muscle spasms seen; muscle strength testing revealed 4 out of 5 strength in the bilateral quadriceps secondary to pain and 5 out of 5 strength in the balance of his bilateral lower extremities; straight leg raises were negative bilaterally. Tr. 507. Secka's Opana was increased from 5 mg to 7.5 mg. Tr. 507. A new Lyrica prescription was provided because Secka indicated he could not fill the prior prescription

---

[4] "The tibial nerve branches off from the sciatic nerve. It provides innervation to the muscles of the lower leg and foot. The tibial nerve generally follows the course of the tibial artery through the body, which supplies blood to the same areas." http://www.healthline.com/human-body-maps/tibial-nerve (last visited 6/19/2017).

[5] Sural nerve is "a sensory nerve in the lower leg that lies close to the small saphenous vein, situated in the calf. As the bundle of fibers form a branch of the femoral nerve, it is also known as 'short saphenous nerve.'" http://www.knowyourbody.net/sural-nerve.html (last visited 6/19/2017).

because there was no diagnosis included with the initial prescription. Tr. 507. Also, Secka was prescribed a Medrol dose pack to be taken for exacerbation of pain. Tr. 507.

Secka saw Dr. Baghai on October 29, 2010. Tr. 566, 571-576. Dr. Baghai observed that Secka had tried physical therapy without relief; injections helped for about a week; Lyrica was helping but Secka's back pain was still significant; and the steroid dose pack was not helping. Tr. 566. Dr. Baghai's physical examination showed positive straight leg raise at about 60 degrees bilaterally with pain in the back and legs. Tr. 566. A neurological examination showed no focal deficits. Tr. 566. Dr. Baghai reviewed a lumbar MRI, noting that it showed evidence of postoperative changes at L5-S1. Tr. 566. Dr. Baghai recommended that Secka continue with conservative treatment, indicating that he believed that the majority of Secka's symptoms were the "result of stressor during the incident of June 1, 2010." Tr. 566.

Secka continued treatment at Advanced Pain Medicine in November and December 2010 with continued reports of pain. Tr. 510-515. Secka indicated that Opana at 10 mg was not helping. Tr. 514. His dosage was increased to 15 mg on December 8, 2010. Tr. 514. Lumbar facet nerve blocks, lumbar facet rhizotomy and a lumbar diskopgraphy were discussed as possible future procedures. Tr. 511, 514.

On January 7, 2011, Secka had bilateral lumbar facet nerve blocks. Tr. 516-518. On January 11, 2011, Secka had a left lumbar facet rhizotomy. Tr. 519-522. Secka reported some improvement from the procedures. Tr. 519 (80% relief for rest of the day from nerve block); Tr. 523 (less left lower extremity pain following the lumbar rhizotomy but increased cramping pain and pressure on the left side and back).

During his January 17, 2011, visit at Advanced Pain Medicine, Secka reported that Opana was not helping so he stopped taking after two weeks. Tr. 523. Also, while Lyrica was helping

his lower extremity pain, he discontinued because it was causing forgetfulness. Tr. 523. On examination, Secka's gait was antalgic, favoring the left lower extremity; and he was tender to palpation of the lumbar paraspinal muscles bilaterally. Tr. 523. Dr. LoDico recommended a right lumbar facet rhizotomy and that Secka restart Lyrica. Tr. 523. A week later, Secka reported that his pain had worsened. Tr. 526. Dr. LoDico started Secka on MS Contin, continued Secka on Lyrica, suggested Tylenol, and indicated that, once Secka's pain settled, a right lumbar facet rhizotomy should be considered. Tr. 526. At a February 10, 2011, follow-up visit, Secka reported that the MS Contin was not working and caused vomiting. Tr. 529. He was not taking Tylenol as suggested. Tr. 529. He was using Aleve. Tr. 529. On physical examination, Secka appeared uncomfortable at times; he rose from a seated position slowly with assistance of his arms; and his gait was slow but not antalgic. Tr. 529. Otherwise, his physical examination was unremarkable. Tr. 529.

On February 28, 2011, Secka had a right lumbar facet rhizotomy. Tr. 536. Following the procedure, on March 10, 2011, Secka reported a significant decrease in his lower extremity pain but was not sure whether it was attributed to the rhizotomy procedure or changes in his medication. Tr. 536. He was still having pain across his back and dorsal aspect of his feet as well as intermittent mild pain in the lateral thigh. Tr. 536. Physical examination findings were generally normal. Tr. 536.

Secka continued pain management treatment at Advanced Pain Medicine through September 2011, receiving lumbar epidural injections on June 21, August 2, and August 22, 2011. Tr. 539-559. During a September 6, 2011, visit at Advanced Pain Medicine, it was noted that Secka received some relief from the series of injections. Tr. 557. The first injection helped for about a week but the back pain returned after Secka's left leg fell through the floor at his

cabin.  Tr. 548, 557.  The second and third injections helped with lower extremity pain but his pain was not completely relieved.  Tr. 557.  Secka reported that a worker's compensation doctor opined that Secka could return to full duty work.  Tr. 557.  Secka reported a new pain in his groin and going into his bilateral lower extremities that he described as quick and intermittent – sharp and burning like being electrocuted.  Tr. 557.  Secka's physical examination was generally normal.  Tr. 557.  Dr. Plowey of Advanced Pain Medicine recommended a lumbar diskography. Tr. 557.  Dr. Plowey noted that Secka last worked in a job requiring significant lifting, bending, twisting and prolonged standing and it was unlikely that Secka could return to that type of work at the time, stating that "we will have him remain off of full duty at this time.  He is restricted to sit, stand and walk ad lib. with no lifting greater than 10 pounds."  Tr. 557.

On October 10, 2011, Secka returned to see Dr. Baghai.  Tr. 565.  Secka reported that his symptoms had been increasing over the prior year and Dr. Baghai indicated that an examination showed "straight leg raising is positive on the left at about 60 degrees.  The remainder of his exam does not show any focal neurological deficit."  Tr. 565.  Dr. Baghai recommended a lumbar MRI and EMG and nerve conduction testing of both legs.  Tr. 565.

A lumbar MRI was taken on October 12, 2011.  Tr. 567.  No significant changes were seen from the prior June 2010 MRI.  Tr. 567.  There continued to be a mild diffuse bulge at L5-S1 but no significant central canal narrowing was seen; mild bilateral neural foraminal and narrowing and lateral recess narrowing was unchanged.  Tr. 567.  EMG nerve conduction studies of the lower extremities were performed on October 17, 2011.  Tr. 568-570.  Physical examination of the lower extremities showed hypoactive deep tendon reflexes; sensation appeared preserved to pinprick, light touch and vibration sense with some patchy alteration noted

on both feet; pedal pulses were palpable; and no footdrop phenomenon was noted. Tr. 600. The

nerve conduction studies were abnormal, with the following findings noted:

> Axonal impairment noted in the right tibial nerve, on the EMG studies diffuse chronic partial denervation changes were seen in multiple myotomes. The abnormalities noted are most consistent with a chronic lumbosacral polyradiculopathy, no abnormalities suggestive of a recurrent acute lumbosacral radiculopathy was noted.

Tr. 568, 600.

Dr. Baghai saw Secka on October 24, 2011. Tr. 564. Secka reported continued left leg

numbness that was sharp, aching, stabbing, burning and tingling. Tr. 564. Dr. Baghai reviewed

the MRI and EMG and nerve conduction study results and recommended a spinal cord stimulator

and further evaluation. Tr. 564.

Secka left Advanced Pain Medicine due to a change in his insurance (Tr. 643), and,

beginning in April 2012, he started pain management treatment at Allied Pain Treatment Center

and continued with treatment there through 2013 (Tr. 587-595, 603-611, 623-642). In January

2014, Secka resumed treatment at Advanced Pain Medicine and continued treatment there

through at least April 2014. Tr. 643-664.

During his April 17, 2012, office visit at Allied Pain Treatment Centers with Dr. Thomas

Ranieri, M.D., physical examination findings included decreased range of motion; pain on

flexion, extension, rotation, side bend; positive straight leg testing; positive Patrick's testing for

back; positive heel walk and toe walk; no motor or sensory deficits. Tr. 587. Dr. Ranieri

assessed post op lumbar laminectomy, lumbar spondylosis, lumbar facet syndrome, and noted a

re-injury in June 2011 that was not worker's compensation. Tr. 587.

Secka returned to see Dr. Ranieri a month later on May 15, 2012, with continued reports

of low back pain into his legs. Tr. 588. Dr. Ranieri's physical examination findings included

decreased range of motion in the lumbar spine; pain on flexion, extension, rotation and side bend; decreased strength; positive straight leg testing bilaterally, left greater than the right; positive Patrick's testing for back pain; inability to heel walk and toe walk; antalgic gait; decreased sensation in L5-S1 distribution in legs and median nerve distribution in hands; no motor or sensory deficits. Tr. 588. Dr. Ranieri assessed neuropathic pain of the lumbar spine area; lumbar spine neuritis; post op lumbar laminectomy 2005; median neuropathy; lumbar spondylosis; lumbar facet syndrome; and noted a re-injury in June 2011 that was not worker's compensation. Tr. 588.

On June 13, 2012, spinal mapping of Secka's left side of the lumbar spine was negative for pain at the L3 area but positive at the L4 and L5 areas. Tr. 590. In July 2012, Secka saw Dr. Secka and reported having fallen in a rabbit hole a couple weeks earlier. Tr. 603. On physical examination, Secka continued to exhibit decreased lumbar spine range of motion, positive Patrick's testing and positive straight leg testing. Tr. 603. On August 21, 2012, Secka saw Dr. Ranieri reporting that he had fallen into a hole that his dog dug out[6] and both of his legs were hurting him. Tr. 605. Dr. Ranieri's physical examination findings included decreased range of motion, positive straight leg testing, positive Patrick's testing for back pain, and positive heel walk and toe walk. Tr. 605. Dr. Ranieri noted that Secka had had good results from lumbar epidural steroid injections in the past and indicated that injections would be set during a subsequent visit. Tr. 606. On October 17 and November 14, 2012, Secka received lumbar epidural steroid injections. Tr. 610, 623-624, 625-626. On December 14, 2012, Secka saw Dr. Ranieri reporting that the injections did not help. Tr. 627.

---

[6] It is not clear whether the hole that Secka reported falling into was the rabbit hole that he previously reported falling into.

In January 2013, Secka reported falling when his dog got under his feet. Tr. 629. Dr. Ranieri's physical examination findings included decreased range of motion, positive straight leg testing, positive Patrick's testing for back pain, and positive heel walk and toe walk. Tr. 605. On March 5, 2013, Secka saw Dr. Ranieri for his low back pain. Tr. 631-634. Physical examination findings were generally normal with tenderness in the lumbar spine. Tr. 633. Dr. Ranieri recommended that lumbar facet blocks and spinal lumbar mapping be scheduled. Tr. 634.

On January 15, 2014, Secka returned to see Dr. LoDico at Advanced Pain Medicine. Tr. 643-645. Secka was wearing a lumbar brace. Tr. 643. On physical examination, Dr. LoDico observed that Secka was uncomfortable at times and was frequently changing positions. Tr. 643. Secka was unable to toe walk, heel walk, and squat. Tr. 643-644. There was mild tenderness to palpation over the right and left paraspinal muscles. Tr. 644. Secka exhibited 5/5 muscle strength with bilateral hip flexion, knee flexion/extension, ankle dorsiflexion/plantar flexion. Tr. 644. Straight leg raise testing for positive bilaterally. Tr. 644. Secka had normal sensation to light touch and temperature throughout his lower extremities bilaterally. Tr. 644. There were no palpable cords, muscle spasms, or true triggerpoints. Tr. 644. Dr. LoDico's assessment was "Lumbar spinal pain secondary to discogenic syndrome versus facet arthropathy lower extremity radicular syndrome with a 4 and 5 radiculopathy." Tr. 644. Dr. LoDico scheduled a left transforaminal lumbar epidural steroid injection. Tr. 644. The epidural injection was administered on January 17, 2014. Tr. 646.

On February 3, 2014, Secka reported some relief from the injection in his left lower extremity but he was having pain that radiated into his lower extremities bilaterally into his feet. Tr. 649. Physical examination findings included some mild tenderness to palpation over the

lumbar paraspinal muscles; 3/5 muscle strength with bilateral hip flexion, knee flexion/extension, ankle dorsiflexion/plantar flexion; positive straight leg raise bilaterally; and normal sensation to light touch and temperature throughout the lower extremities bilaterally. Tr. 649. Dr. LoDico recommended a provocative discography once insurance was obtained. Tr. 649. Dr. LoDico started Secka on Hydrocodone. Tr. 649. In March 2014, OxyContin was prescribed in place of Hydrocodone because Secka now had the insurance to cover. Tr. 652.

On April 1, 2014, a provocative discography at L5-S1, L4-5, and L3-4 was performed. Tr. 655-658, 662. The discography showed an L5-Sl concentric tear pattern with degenerative narrowing of disc and desiccation, borderline central stenosis, endplate marginal spur formation, and significant hypertropic changes of facets especially on the right side with the bilateral foraminal stenosis greater on the right. Tr. 662. During an April 11, 2014, visit with Dr. LoDico, a physical examination revealed positive straight leg raise bilaterally and 5/5 muscle strength with bilateral hip flexion, knee flexion/extension, ankle dorsiflexion/plantar flexion. Tr. 659. Secka was taking OxyContin with partial relief and no side effects but Secka did not feel that it was lasting very long. Tr. 659. Dr. LoDico increased Secka's OxyContin and discussed the possibility of proceeding with a lumbar diskectomy at L5-S1. Tr. 659.

The record contains additional evidence submitted to the Appeals Council but not the ALJ. Tr. 2, 5, 60, 709-719 (Exhibit 17F), 720-728 (Exhibit 18F). The additional documents are records from neurological evaluations performed by Dr. Vincent J. Miele, M.D., of UPMC and Dr. Jahangir Maleki, M.D., Ph.D., of the Cleveland Clinic Foundation Neurological Center for Pain, in 2014. Tr. 709-711, 712-714, 720-722.

## 2. Opinion evidence

*Examining physician James Cosgrove, M.D.*

In connection with his worker's compensation claim, on July 14, 2011, James L. Cosgrove, M.D., evaluated Secka. Tr. 382-395. Dr. Cosgrove noted that Secka's chief complaint was back pain with intermittent leg pain, left worse than right. Tr. 383. As far as Secka's activities of daily living, Secka reported he did not do any grass cutting and did not do any significant outdoor activities; he was independent in his self-care and dressing; he went to his cabin along the Allegheny River and fished on occasion but did not do anything strenuous; he would occasionally overdo his physical activities and have to lie down. Tr. 393, 394. He was able to perform normal daily childcare. Tr. 394. Secka's social activities included working on his cabin, boating and fishing. Tr. 394. Secka drove a car and had driven as far as an hour and 15 minutes from his home to his work. Tr. 394. Dr. Cosgrove reviewed Secka's treatment history and conducted a physical examination. Tr. 383-391. Dr. Cosgrove's assessment was:

> Back pain - At present Mr. Secka complains bitterly of back pain which is of unremitting nature. Subjectively he has severe pain but there is no objective correlation to any specific anatomic structure or physiologic process. He has a previous history of lumbar surgery with good resolution with surgery and interventional treatment. Previous diagnostic studies have been performed but are not available for review except through the radiographic reports. Various interventiona1techniques have been done since over the last year with no improvement in pain or function. Most recent injection done in the "center of my back" approximately a week ago offered no benefit.

Tr. 391.

Based upon Dr. Cosgrove's review of the record, it was his opinion that Mr. Secka could return to full time active work duties without restriction. Tr. 392. Dr. Cosgrove also was of the opinion that Secka should not undergo further treatment because objective findings were lacking

and pain persisted notwithstanding the intervention. Tr. 392. Dr. Cosgrove noted that Secka was taking Cymbalta but found no evidence to suggest neuropathic pain or diabetic peripheral neuropathy. Tr. 392. Therefore, Dr. Cosgrove could not support Secka's continued use of Cymbalta. Tr. 392. Dr. Cosgrove concluded that Secka's prognosis was fair, finding no objective reasons or anatomic abnormality to account for Secka's ongoing pain complaints. Tr. 393. Thus, despite Secka's continued complaints, Dr. Cosgrove felt that Secka had reached maximal medical improvement. Tr. 393.

*Reviewing physicians*

On October 10, 2012, state agency reviewing physician Eli Perencevich, D.O., completed a Physical RFC Assessment. Tr. 114-116. Dr. Perencevich opined that Secka had the following exertional limitations – could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push/pull unlimitedly, except as shown for lift/carry. Tr. 114-115. Dr. Perencevich opined that Secka had the following postural limitations – occasional climbing ramp/stairs; occasional stooping, kneeling, crouching, and crawling; and no climbing ladder/ropes/scaffolds. Tr. 115. Dr. Perencevich indicated that the postural limitations were due to lumbar degenerative disc disease. Tr. 115. Dr. Perencevich opined that Secka had the following manipulative limitations – limited reaching overhead on the right and left. Tr. 115. Dr. Perencevich explained that Secka's degenerative disc disease limited Secka's overhead reaching to frequently due to limited extension. Tr. 116. Dr. Perencevich also opined that Secka would have to avoid even moderate exposure to unprotected heights. Tr. 116.

Upon reconsideration, on March 15, 2013, state agency reviewing physician Gerald Klyop, M.D., completed a Physical RFC Assessment. Tr. 142-144. Dr. Kylop reached the same opinions regarding Secka's Physical RFC Assessment as Dr. Perencevich. Tr. 142-144.

## C. Testimonial evidence

The administrative hearing was held on June 24, 2014. Tr. 61. During the hearing, the ALJ requested that Secka's counsel obtain and submit additional records and left the hearing open until July 8, 2014, for that purpose. Tr. 65-67, 73-76, 77, 80, 88. The ALJ also suggested to Secka's attorney that he discuss with Secka the possibility of amending the onset date. Tr. 73-74.

### 1. Plaintiff's testimony

Secka was represented and testified at the hearing. Tr. 63-80. Secka indicated that his fiancé was a cancer survivor and on disability but she was getting ready to attend college. Tr. 67-68. Secka discussed his activities of daily living, explaining that he does not do a lot during the day. Tr. 67-80. He mainly lies around, watches television, and talks on the phone to friends. Tr. 67. He gets outside if he is having a good moment and able to get up and move. Tr. 68. In a one-week period, Secka estimated having one good day, four moderate days, and two bad days. Tr. 68-69. He is not able to pick up any of his children anymore because it is too painful. Tr. 68. Secka is able to drive and has a commercial driver's license. Tr. 69. His fiancé and her daughter do most of the chores around the house and, if there is something big that needs taken care of, Secka's friends help out. Tr. 69. Secka had a worker's compensation claim in 2010. Tr. 65-66, 78-79.

## 2. Vocational Expert

Vocational Expert Linda Dezack ("VE") testified at the hearing.  Tr. 81-88.   The VE indicated she had reviewed the file, including Secka's 15-year work history.  Tr. 81-82.  The VE classified Secka's various jobs as follows: (1) EMT – a low-skilled (SVP 5),[7] medium job, but performed by Secka at heavy level; (2) metal fabricator, laborer – a mid-skilled (SVP 7), heavy job; (3) maintenance building manager – mid-skilled (SVP 7), medium job, but performed by Secka at heavy level; (4) maintenance person – high-skilled (SVP 8), heavy job; (5) tractor trailer driver – high semi-skilled (SVP 4), medium job, but performed by Secka at heavy level; (6) van driver – low semi-skilled (SVP 3), medium job, but performed by Secka at sedentary level; (7) kitchen appliance repairer – mid-skilled (SVP 7), medium job, but performed by Secka at heavy level.[8]  Tr. 82-83.   When classifying Secka's past work, the VE asked the ALJ if he wanted DOT numbers.  Tr. 82.  The ALJ responded, "No. We'll save time by not going into the DOT numbers.  Give me the exertional capacity and skill level."  Tr. 82.

The ALJ asked whether there was transferability of any of the skills for the identified jobs.  Tr. 83.  The VE responded that the driving skills were transferable to the light level, identifying telephone directory distributor and a truck load checker.  Tr. 83-84.

The ALJ then asked the VE to assume an individual Secka's age and with his education and work experience who was capable of lifting 20 pounds occasionally and 10 pounds

---

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Soc. Sec. Admin.  December 4, 2000).   Using the skill level definitions in 20 CFR § 404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

[8] The record includes reference to another past job, i.e., boiler engineer at a veneer plant, but the VE indicated that there was no description of the job so she had not classified the position.  Tr. 82.  Also, it appears that the VE identified another past job but the transcript is not clear as to the title of the job.  *See* Tr. 82-83 ("As an h back, skill level . . .").

frequently; standing or walking 6 out of 8 hours; sitting 6 out of 8 hours; unlimited pushing and pulling; never climbing ladders, scaffolds, and unprotected heights; occasionally climbing stairs, bending, kneeling, crouching and crawling; and reaching overhead bilaterally limited to less than occasional. Tr. 84-85. The VE indicated that the described individual would be able to perform Secka's past work as a van driver as actually performed but not as customarily performed. Tr. 84-85. The VE indicated all other past work would be eliminated because the exertional level would be exceeded. Tr. 85. The VE indicated that there would be other work available in the national and regional economy, including (1) information clerk, a light, unskilled job; (2) laundry worker, a light, unskilled job; and (3) flagger, a light, unskilled job. Tr. 85-86. The VE provided national and regional job incidence data for the identified jobs as well as DOT numbers, which the ALJ requested. Tr. 85-86.

The ALJ then asked the VE to assume the individual described in the first hypothetical with the additional limitation of requiring 3-5 minutes of off-task time, possibly to change positions or take a short walkabout break, every 2 hours in an 8-hour workday in addition to standard breaks. Tr. 86. The VE indicated that the three jobs identified would remain available to the individual because that amount of off-task time would be less than 10% of the time. Tr. 86-87.

In response to questioning by Secka's counsel, the VE indicated that a hypothetical individual, who was limited to a sedentary RFC and who would be absent two or more days per month on a regular basis, would be unable to maintain employment. Tr. 87. Also, The VE indicated that, if the ALJ's second hypothetical was modified such that the described individual would be off task 15% of the time on a regular basis, the individual would be unable to maintain employment. Tr. 87-88. Finally, the VE indicated that, if the ALJ's first hypothetical was

modified to include the need for the individual to lie down at unscheduled random times throughout the day, the individual would not be able to perform work without a special accommodation from the employer.  Tr. 88.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his January 14, 2015, decision, the ALJ made the following findings:[11]

1.    Secka meets the insured status requirements through December 31, 2015.  Tr. 43.

2.    Secka has not engaged in substantial gainful activity since June 1, 2010, the alleged onset date.  Tr. 43.

3.    Secka has the following severe impairment: degenerative disc disease in the lumbar spine.  Tr. 43-49.  Adjustment disorder was not a severe impairment and overuse of narcotic pain medication was not a medically determinable impairment.  Tr. 47-49.

4.    Secka does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 49.

---

considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[11] The ALJ's findings are summarized.

5.    Secka has the RFC to perform a limited range of light work.  He can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand/walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl but cannot climb ladders, ropes and scaffolds; can occasionally reach overhead with both hands.  Tr. 50-52.

6.    Secka is capable of performing past relevant work as a van driver as actually performed by Secka.  Tr. 52.

7.    The VE testified that Secka's driver skills were transferrable to the jobs of telephone directory delivery person and truckload checker.  Tr. 52-53.  Thus, alternatively, considering Secka's age, education,[12] work experience, and RFC, there are other jobs in the national economy that Secka can perform, including telephone directory delivery person and truckload checker (both light, SVP 3 jobs).  Tr. 52-53.  Also, the VE identified light, unskilled jobs that could be performed by an individual of the same age and with the same education, work experience, and RFC as Secka, including information clerk, flagger, and laundry worker.  Tr. 53.

Based on the foregoing, the ALJ determined that Secka was not under a disability from June 1, 2010, through the date of the decision.  Tr. 53.

## V. Parties' Arguments

Secka argues that the ALJ erred at Step Four by finding that Secka could return to his past relevant work as a van driver.  Doc. 17, pp. 9-11.  Also, Secka challenges the ALJ's light RFC finding arguing that the ALJ erred in assessing the evidence when he concluded that there was an absence of neurological deficits and that the ALJ's reliance upon state agency reviewing physician Dr. Klyop's opinion was misplaced.  Doc. 17, pp. 11-14.

In response, the Commissioner contends that the ALJ properly relied upon the VE's testimony to support his determination that Secka could perform his past work as a van driver, and, in any event, the ALJ alternatively found that there were other jobs existing in the national

---

[12] Secka was born in 1973 and was 37 years old on the alleged disability onset date.  Tr. 52.  He has at least a high school education and is able to communicate in English.  Tr. 52.

economy that Secka could perform.  Doc. 20, pp. 12-15.  The Commissioner also contends that substantial evidence supports the ALJ's RFC finding.  Doc. 20, pp. 8-12.

## VI. Law & Analysis

### A.        Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Nevertheless, even if there is substantial evidence to support a decision, the Commissioner's decision will not be affirmed where the Social Security Administration "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec. Adm.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 741, 746 (6th Cir. 2007)); *see

also Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011). Similarly, a court "cannot

uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision,

where the reasons given by the trier of fact do not build an accurate and logical bridge between

the evidence and the result.'" *Fleischer*, 774 F.Supp.2d at 877 (quoting *Sarchet v. Chater*, 78

F.3d 305, 307 (7th Cir. 1996) and relying on *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-

546 (6th Cir. 2014)).

**B.      In the absence of further explanation by the ALJ, the Court is unable to determine
whether the RFC is supported by substantial evidence**

Secka challenges the ALJ's light RFC finding arguing that the ALJ erred in assessing the

evidence when he concluded that there was an absence of neurological deficits. Doc. 17, pp. 11-

14.

A claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a

claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3),

404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20

C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In

assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician

verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly

assume the role of a medical expert by assessing the medical and nonmedical evidence before

rendering a residual functional capacity finding." *Id.*

The ALJ based the light RFC assessment on "the objective medical records and the

opinion of Dr. Klyop." Tr. 52. In assessing and weighing the evidence, the ALJ concluded that

Secka "has low back pain but he does not have any neurological deficits." Tr. 52; *see also* Tr. 45

("The claimant's physical exams did not shown any neurological deficits."). Without a more complete explanation, this conclusion, which the ALJ relied upon to support his RFC finding, appears at odds with evidence of record.

For example, there is evidence that Secka was unable to walk on his heels and toes, had an antalgic gait, had decreased sensation to light touch in the lateral aspect of the right lower leg distal to the knee, had decreased sensation to temperature in the lateral aspects of bilateral lower legs, had decreased sensation in the L5/S1 distribution in his legs, and had hypoactive deep tendon reflexes in the lower extremities. Tr. 490 (8/3/10), Tr. 507 (10/20/10), Tr. 523 (1/17/11), Tr. 588 (5/15/12), Tr. 590 (6/13/12), Tr. 600 (10/17/11). The ALJ acknowledged some of these examination findings (Tr. 46) but nevertheless concluded that there was no evidence of neurological deficits.

Further, based on his conclusion that physical examination findings showed no neurological deficits, the ALJ dismissed objective EMG and nerve conduction studies from October 1, 2010, that showed bilateral L4 and right L5 radiculopathy without new or active denervation, bilateral tibial motor mononeuropathy, bilateral sural sensory mononeuropathy (Tr. 560-562). Tr. 45. Other objective medical tests included a provocative discography, performed on April 1, 2014, which showed an L5-Sl concentric tear pattern with degenerative narrowing of disc and desiccation, borderline central stenosis, endplate marginal spur formation, and significant hypertropic changes of facets especially on the right side with the bilateral foraminal stenosis greater on the right. Tr. 662. Even though the test results do not rule out abnormalities on the left, the ALJ's apparent reason for disregarding this objective test was because Secka complained more about left leg pain than right leg pain. Tr. 47.

Also, on multiple occasions, Secka's examinations showed positive straight leg-raising test findings.  *See* Tr. 490 (8/3/10), Tr. 566 (10/29/10), Tr. 565 (10/10/11), Tr. 587 (4/17/12), Tr. 588 (5/15/12), Tr. 590 (6/13/12), Tr. 603 (7/11/12), Tr. 605 (8/21/12), Tr. 644 (1/15/14); Tr. 659 (4/11/14).  A straight leg-raising test revealing "pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900.  Although the ALJ acknowledged evidence of positive straight leg-raising test findings (Tr. 45-47), the ALJ concluded, without sufficient explanation, that there was no evidence of neurological deficits.[13]

The evidence also documents positive Patrick's testing for back pain; decreased range of motion in the lumbar spine; pain on flexion, extension rotation and side bend; and spinal mapping testing of the left lumbar side that was negative for pain at the L3 area but positive at the L4 and L5 areas.  Tr. 587 (4/17/12), Tr. 588 (5/15/12), Tr. 590 (6/13/12).

Although it is the province of the ALJ to assess a claimant's RFC, in this instance, the ALJ failed to build a logical bridge connecting the evidence with his result.  Thus, even if there is substantial evidence to support the decision, this Court is unable to uphold it.  *See e.g.*, *Fleischer*, 774 F.Supp.2d at 877.  Accordingly, remand is warranted for further explanation as to how, in light of the various examination findings and objective tests, the ALJ concluded that Secka did "not have any neurological deficits."  Tr. 52 (emphasis supplied).

---

[13] For example, when summarizing Dr. Baghai's October 29, 2010, and October 10, 2011, examination findings, which included positive straight leg raising, the ALJ stated that there were no neurological deficits.  Tr. 45, 46.  Dr. Baghai's actual findings were that "Neurological examination does not show any focal deficits" (Tr. 566) and ". . . straight leg raising is positive on the left at about 60 degrees.  The remainder of his exam does not show any focal neurological deficit." (Tr. 565). (Emphasis supplied).  Without explaining whether there is a distinction between "neurological deficit" and "focal neurological deficit," the ALJ dropped the reference to "focal" when referring to Dr. Baghai's findings.

Secka also challenges the ALJ's reliance upon the state agency reviewer's opinion and the ALJ's Step Four determination.  Since further analysis and/or explanation of the evidence on remand may impact subsequent steps in the evaluation process and/or the disability determination analysis as a whole, the Court declines to address these alternative arguments.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for proceedings consistent with this Opinion.

Dated: June 20, 2017

Kathleen B. Burke
United States Magistrate Judge